Donald HOWARD and Paul B. Hammons,
co-partners d/b/a Howard and Ham-
mons, Appellee,

v.

Jack W. JESSUP and Jack W. Jessup, Jr.
co-partners d/b/a Stockman's Livestock
Commission Company, Appellant.

No. 45539.

Supreme Court of Oklahoma.

Dec. 18, 1973.

Rehearing Denied March 19, 1974.

**914**

James H. Ivy, Waurika, Bill Anderson, Oklahoma City, for appellee.

Clarence P. Green, Green & James, Oklahoma City, for appellant.

WILLIAMS, Vice Chief Justice.

This is an appeal by defendant from a judgment for plaintiff in an action for damages for conversion of personal property.

Both plaintiff and defendant are partnerships. Defendant partnership is in business as a livestock commission firm in the Oklahoma City stockyards. The property allegedly converted was 41 head of cattle owned by plaintiff partnership. These cattle were stolen by one Pfeifer, who took them to the Oklahoma City stockyards and consigned them to defendant partnership which, as a livestock commission firm, sold them to third parties and accounted for the proceeds of the sale to Pfeifer. The verdict and judgment for plaintiff were for the value of the cattle plus interest from the date of the sale. In answer to a "special verdict" also submitted to them by the court, the jury found that at the time of the sale, defendant did not know that Pfeifer was not authorized to sell the cattle.

The rule under which the judgment was rendered is stated as follows in 32 Am. Jur.2d Factors and Commission Merchants, § 45:

"As a general rule, a factor or commission merchant who received property from his principal, sells it under the latter's instructions, and pays him the proceeds of the sale, is guilty of a conversion if his principal had no title thereto or right to sell the property, and the factor may not escape liability to the true owner for the value of the property by claiming that he acted in good faith and in ignorance of his principal's want of title."

To the same general effect, see 35 C.J.S. Factors, § 57b.

It is said that this rule is "the general and almost universally recognized rule at common law;" see 2 A.L.R.2d 1124 and 20 A.L.R. 132.

■ On appeal, defendant freely concedes the validity of the rule quoted above, but argues in effect in the first proposition that under the particular facts in this case, defendant was not liable. The line of argument is that the allegedly wrongful acts attributed to defendant are "passive and do not amount to the exercise of dominion over the property or the assertion of title inconsistent with that of the owner".

This argument rests upon the premise that under the method of doing business then followed at the Oklahoma City stockyards, the cattle were never in the actual physical possession of the commission merchants such as defendant. Actual possession of the goods is one of the distinguishing characteristics of the relation of principal and factor; 32 Am.Jur.2d Factors and Commission Merchants, § 2.

The record does not support this argument. The method of doing business was established for defendant by the testimony of Mr. J, one of the owners of defendant partnership. He said that when an owner brings his cattle to the stockyards, he delivers them into the possession of the Stockyards Company, a firm which pro-

vides the unloading chutes and pens at the stockyards and furnishes labor and facilities for the care and feeding of the animals. The owner then chooses one of the sixteen available commission firms (such as defendant) to handle the sale of the cattle; when the sale arrangements are completed and the purchase price collected, the buyer accepts delivery of the cattle from the Stockyards Company.

However, Mr. J also testified, when asked how the commission firm learns that it has been chosen, that "The cattle are delivered to *our pens* with a copy—I believe there are three copies of the weigh bill" (emphasis added). When asked what services the commission firm provides, Mr. J said that " * * * We sort their cattle as we think most advantageous for sale purposes and find a buyer for them".

It is apparent from this uncontradicted testimony of defendant's own witness that defendant partnership had the actual possession of the property and exercised dominion over it, and this is true even if by the phrase "our pens" Mr. J meant pens made available only for defendant's temporary use. It may be observed also that the cases cited in support of defendant's argument under this proposition (Kelly v. Oliver Farm Equipment Sales Company, 169 Okl. 269, 36 P.2d 888; and McJunkin v. Hancock, 71 Okl. 257, 176 P. 740) do not involve the relation of principal and factor and are therefore not in point on the facts.

In the second proposition on appeal, defendant argues that plaintiff's proof in the trial court that Pfeifer stole the cattle and sold them through defendant commission firm was made by evidence consisting of hearsay testimony that was not admissible under any exception to the hearsay rule.

The testimony was admittedly hearsay. It was provided by Mr. L who was, at the time of the theft and sale, the County Attorney of Jefferson County, in which the theft occurred. (When plaintiff attempted to take Pfeifer's deposition for use in this case, Pfeifer refused to testify on Fifth Amendment grounds.) Mr. L testified that, in his presence and hearing, Pfeifer confessed that he stole the cattle and sold them through defendant commission firm in the Oklahoma City stockyards. He also identified a typed confession to the same effect, signed by Pfeifer in his presence. This testimony was admissible, if at all, under the "declarations against interest" exception to the hearsay rule. See 29 Am.Jur.2d Evidence, §§ 617, et seq. Defendant argues, however, that in order for a declaration against interest to be admissible, it must be against pecuniary or proprietary interest of the declarant, and not merely against his personal interest, citing Aetna Life Ins. Co. v. Strauch, 179 Okl. 617, 67 P.2d 452 (1937).

In *Aetna,* supra, this Court said that " * * . * a declaration against physical or personal interest as distinguished from pecuniary or proprietary interest, does not qualify a statement for admission in evidence * * *" under the exception to' the hearsay rule. Although that statement in the opinion is subject to objection as dictum (the declaration against interest in that case was held admissible as against the *pecuniary* interest of the declarant, who admitted that he had murdered his wife in a scheme to collect her life insurance) it must be conceded that the quoted statement represented what was, at least at that time, the general rule.

Nevertheless, the rule has been under almost continuous attack for many years. The distinction between declarations against pecuniary interest and declarations against personal or "penal" interest, including admissions that the declarant has committed a crime, was apparently first made in 1844 by the House of Lords in the Sussex Peerage Case, 11 Cl. and F. 109, 8 Eng.Rep. 1034. In that case, the son of the deceased Duke of Sussex attempted to prove his legitimacy and his right to inherit the lands and titles of his father, the sixth son of King George III. The principal issue was the force and effect of marriage vows allegedly exchanged in 1793 in Rome between claimant's father and moth-

er, and the determining question of law was whether the marriage, if it occurred, was either void or voidable under the Royal Marriage Act, 12 Geo. 3, c. 11. In the course of attempting to prove that the ceremony was actually performed, claimant offered the testimony of the son of the then deceased officiating clergyman, a minister of the Church of England, who happened to be in Rome at the time, that his father admitted to him that he had performed the ceremony. Under the Royal Marriage Act, if applicable, the clergyman was subject to criminal prosecution if he actually participated in the ceremony. The offer was rejected as not being against the *pecuniary* interest of the clergyman.

Professor Wigmore has called the holding in *Sussex* arbitrary, illogical and contrary to 200 years of precedents. Wigmore on Evidence, 3rd ed., §§ 1476 and 1477. It is also interesting to note that the question upon which the case was actually decided, as framed by the Lord Chancellor, *assumed* that the ceremony in Rome had actually been performed (8 Eng.Rep. 1056) and the opinion of the Judges which actually decided the law in the case, delivered by Lord Chief Justice Tindal, does not mention or discuss the prior ruling of the Lord Chancellor rejecting the proffered testimony of the deceased clergyman's son.

The objections to the rule first stated in *Sussex* were rather bluntly stated by Mr. Justice Holmes in 1913 in his dissenting opinion in Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820. In that case, Donnelly had been convicted of murder on an Indian Reservation, and in affirming the conviction, the United States Supreme Court discussed and approved the ruling of the trial court excluding proffered testimony as to the confession of one Joe Dick, then deceased, that he himself had actually committed the murder, upon the ground that Dick's declaration was not against his *pecuniary* interest. In the dissenting opinion, Justice Holmes said:

> "The confession of Joe Dick, since deceased, that he committed the murder for

which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make anyone outside of a court of justice believe that Donnelly did not commit the crime. \* \* \* The rules of evidence in the main are based on experience, logic, and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; *no other statement is so much against interest as a confession of murder;* it is far more calculated to convince than dying declarations, which would be let in to hang a man \* \* \*. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. \* \* \*" (Emphasis added).

In Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 184, 162 A.L.R. 437, the judgment of the trial court rested, in large measure, upon evidence, admitted under the "declaration against interest" exception to the hearsay rule which consisted of a detailed confession by one Schilling that he had committed the crime of perjury. It was argued on appeal that since Schilling's declaration was not against his pecuniary interest, the evidence was not admissible. In rejecting this argument, the Missouri Supreme Court held, in effect, that it was "completely unrealistic" to say that a confession of perjury is not sufficiently against one's interest to be admissible under the exception.

In Deike v. Great Atlantic and Pacific Tea Company, 3 Ariz.App. 430, 415 P.2d 145, not precisely in point on the facts, the Arizona court, in discussing this question, said: "Penal interest is certainly as important to a person as pecuniary or proprietary interest and would appear to be an

equal stimuli to telling the truth or a deterrent to false statements".

In 29 Am.Jur.2d Evidence, § 620, at page 674, it is said:

" * * * However, in an increasing number of jurisdictions such declarations [confessions of criminal acts] have been held admissible, at least under special circumstances. It has been said that the rule excluding such declarations is unsatisfactory, arbitrary, and unsound, and that it is reasonable and safe to assume that the principle of self-protection and self-interest which admits declarations against pecuniary or proprietary interest, in certain cases where the declarant is unavailable as a witness, operates with at least equal force in cases of declarations against penal interest."

In a footnote on the same page, it is noted that Rule 509 of the Model Code of Evidence of the American Law Institute provides that a declaration is against the interest of a declarant if it subjects him to criminal liability.

In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the United States Supreme Court, from the practical standpoint, may be said to have moved much closer to the views expressed in the dissenting opinion of Justice Holmes in *Donnelly*. In *Chambers,* the Court held that under the particular circumstances in that case, the exclusion of declarations against penal interest, with other errors, amounted to a denial of the defendant's due process rights to a fair trial. In discussing the limitation of the declaration against interest exception to declarations against *pecuniary* interest, the Court said:

"This materialistic limitation on the declaration-against-interest hearsay exception appears to be accepted by most States in their criminal trial processes, although a number of States have discarded it. Declarations against penal interest have also been excluded under authority of Donnelly v. United States, 228 U.S. 243, 272–273, 33 S.Ct. 449, 459, 57 L.Ed. 820 (1913), although exclusion would not be required under the newly proposed Federal Rules of Evidence.
* * *
" * * *

"We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.
* * *"

It is said that the reason for the "declaration against interest" exception to the hearsay rule is " * * * the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus sufficiently sanctioned, though oath and cross-examination are wanting"; Wigmore on Evidence, 3rd Ed., § 1457. To the same general effect, see 32 Am.Jur.2d Evidence, § 617.

After careful consideration, we cannot accept the proposition that a man's admission or declaration that might subject him to imprisonment in the penitentiary or (as it did in *Aetna*) death in the electric chair, is less trustworthy or less likely to be true than a declaration which would subject him to mere pecuniary liability. We therefore hold that the testimony of Mr. L regarding the declaration against interest by Pfeifer, which declaration patently subjected Pfeifer to possible criminal sanctions, was properly admitted under the "declaration against interest" exception to the hearsay rule. To the extent that our prior holding in *Aetna* is in conflict herewith, the same is hereby expressly overruled.

■ Defendant also argues under this proposition that the evidence of Pfeifer's declaration against interest was inadmissible because it was made under circumstances indicating a motive to falsify. The argument is that the confession was the result of "plea bargaining" during the course of which Pfeifer was promised a suspended sentence.

The record does not support this argument. The only competent testimony in

this case on this question consists of the unequivocal testimony of Mr. L that there was no "deal". Although during argument on a motion in limine, made during the course of the trial, defendant offered to prove that Pfeifer had testified at his preliminary hearing in the criminal case that his confession and guilty plea (later permitted to be withdrawn) were made only after a promise of a suspended sentence, this statement was immediately challenged by plaintiff's counsel, who had a transcript of the preliminary hearing. Also, the testimony of Mr. L that Pfeifer did not testify at all, either at the preliminary hearing or the ensuing trial of the criminal case, was not challenged in any way on cross examination. The same is true of Mr. L's testimony that, prior to Pfeifer's confession, he was given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Under these circumstances we cannot say that the trial court's determination that no motive to falsify existed was erroneous.

■ In a final proposition defendant argues that in case the judgment is not reversed or vacated, it should be reduced in the amount of "pre-judgment interest" for 34 months, representing the length of time between a request for continuance by plaintiff upon the ground of unavailability of a witness (Pfeifer, who was claiming his right not to incriminate himself) and the time the case was actually tried. Defendant argues that the continuance was granted upon condition that plaintiff "keep track of Pfeifer's criminal appeal", and that such appeal was decided by the Court of Criminal Appeals two and one half months after the continuance was granted.

The condition attached to the granting of the continuance appears to have been made on the theory that when the appeal of Pfeifer's conviction in the criminal case was finally decided, his right, or desire, to refuse to testify would cease to exist. However, Pfeifer was not convicted of the theft of the 41 cattle herein involved (in April) but of a later theft of other cattle belonging to plaintiff (in June of the same year). See Pfeifer v. State, Okl.Cr.App., 460 P.2d 125. Also, as we have seen, plaintiff finally elected to go to trial in this case without the testimony of Pfeifer, thus running a substantial risk that the only evidence in plaintiff's possession as to the actual theft by Pfeifer and sale by defendant—the testimony of Mr. L—might be ruled inadmissible under the rule from *Aetna.* For all of these reasons, we cannot say that plaintiff was guilty of failure to mitigate its damages.

The judgment of the trial court is affirmed.

Appellee (plaintiff in the trial court) seeks judgment on the supersedeas bond. See Rule 31 of this Court, 12 O.S.1971, Ch. 15, App. 1.

The record shows that the judgment was superseded by a bond wherein appellant (defendant in the trial court) is principal and Hartford Accident and Indemnity Co. is surety. The conditions of the bond have become obligatory.

Now, therefore, appellee, Donald Howard and Paul Hammons, a co-partnership d/b/a Howard and Hammons, is hereby granted judgment against Hartford Accident and Indemnity Co., as surety, for the sum of $6,316.60, together with interest at six per cent per annum from April 4, 1966 to January 20, 1972, and thereafter at ten per cent per annum until paid, and for all costs accrued and accruing in the trial court, but in no event to exceed $10,000.00.

All the Justices concur.